GREER ET AL., APPELLANTS, *v.* COLUMBUS MONTHLY PUBLISHING CORP. ET AL., APPELLEES.

(No. 81AP-547—Decided May 6, 1982.)

*Mr. Henry W. Eckhart* and *Mr. W. Ronald Beaver,* for appellants.

*Messrs. Moots, Hultin, Weinberger & Cope* and *Mr. Robert M. Weinberger,* for appellees.

MCCORMAC, J. Plaintiffs-appellants, who were the owners of a restaurant, the Aspen Inn, sued the Columbus Monthly Publishing Corporation, its owner, its editor and two writers for libel for the written publication of a critical article about the Aspen Inn in the January 1979 issue. Defendants-appellees denied liability and asserted various affirmative defenses. By agreement of counsel, plaintiffs limited their evidence to the issue of liability following which defendants moved for a directed verdict upon the issue of liability. The motion for directed verdict was sustained and final judgment was rendered in favor of the defendants.

Plaintiffs have appealed, asserting the following assignments of error:

"1. The trial court erred when it ruled that the article does not constitute libel.

"2. The trial court erred when it found that the plaintiffs were public figures.

"3. The trial court erred when it concluded that the article complained of consisted solely of opinion.

"4. The trial court erred in granting the defendants' motion for directed verdict."

The assignments of error are combined for discussion, as the sole issue is whether there was a proper basis for the trial court to direct a verdict in favor of defendants.

The article contained in the January 1979 Columbus Monthly issue that gave

rise to the lawsuit, reads, as pertinent, as follows:

"We've noticed lots of places around town lately that are masquerading as restaurants but might better be described as high-class fast-food joints. For a substantial cash outlay, you get a ritzy decor, something to eat and waiters who aren't surly. What you also get is a thinly disguised effort to milk you for every penny of profit. One way this is done is to cut corners on the preparation of the food. Another is to try to zip you through the 'restaurant' with a maximum expenditure in a minimum of time so that more meals can be served.

"The Aspen Inn and the Tamarack are high-class fast-food joints. One saving grace at the Aspen Inn is that it does take reservations, an ordinary amenity not provided by the Tamarack and numerous other Columbus restaurants. The Tamarack is saved to some extent by some fine entrees, including superb baked spareribs.

"* * *

"ASPEN INN

"The Aspen Inn has two problems. One is a geographical schizophrenia: the menu and the decor are a couple of thousand miles apart. The other is mediocrity, which is more debilitating than the personality split.

"As the name suggests, the Aspen Inn is set up to look like a ski lodge. Since you probably haven't schussed down the road to get there, the restaurant has to drive the point home pretty hard. There's a ski lift chair in the lobby for the clientele to swing in, artwork showing Aspen, Colorado, cross skis and poles on the wall and a plastic ski in your cocktail. The atmosphere is pleasant and grotto-like. Warm brick walls, stained glass and candles on the tables give the restaurant a cozy glow.

"The restaurant owner, Dick Grier [sic], is a ski buff who set out to copy in Columbus a restaurant in Aspen called the Aspen Mining Company. He has chosen for his most recent manager a fellow named Tom Larcomb, whose hobby is fishing and who is pushing a line of seafood. He's not selling Rocky Mountain trout, mind you, but a variety of ocean-going critters flown in fresh, mostly from Key West.

"One wouldn't quibble about geography if the fish and shellfish had received decent treatment once they got to Ohio. The 'Key West platter' ($7.95) with three kinds of fish, a stone crab claw and scallops or oysters seems a great idea. But the night we tried it the fish on the Key West platter tasted like old ski boots, the scallops were no more than fair and the 'beer-boiled shrimp' were barely worth peeling.

"Nor is the rest of the menu anything to go cross-country for. Among the hors d'oeuvres, the oysters Rockefeller ($3.25) are the best bet. They have good flavor in a creamy sauce, although there isn't a whole lot of spinach. Escargots stuffed in mushrooms ($3.25) are dull. They were slightly rubbery when we tried them and didn't have enough garlic in the butter.

"The 'coquilles St. Jacques' was outrageously bad. Some innocent scallops had been immersed in a sauce that tasted of nothing more than bouillon and milk and surrounded by a ring of dry, cheese-flavored potatoes. To call this atrocity what they do is misleading. 'Key West shepherds' pie' would fit better.

"The salad, which comes with dinner, suffers a fate similar to that of the scallops in the 'coquille.' Dry, crisp lettuce, thinly sliced mushrooms and red cabbage have been overwhelmed by croutons from a can and dressing from a bottle.

"The non-piscatorial entrees fail to save the day. Veal Marsala ($7.25) is a thick hunk of veal with a sauce that tastes more Chinese than Italian, as if it was made with soy sauce instead of the Marsala wine we are assured goes into the cooking. The prime rib ($9.25 king size and $7.95 queen size) has no flavor itself.

All of the seasoning comes from the Lawry's seasoned salt in the juice.

"Except for a reasonably good chocolate mousse, there is no reason to have trouble staying on a diet at dessert time. The Key Lime mousse is mushy and full of artificial flavoring and gelatin. The tasteless chocolate eclair has been frozen and the cheesecake is dry. (All desserts are 95 cents.) There is good, hot coffee served in mugs (50 cents).

"It is no accident that the dessert menu is weak. 'We downplay the desserts because we want the tables to turn,' Larcomb told us. 'If you have a reputation for good desserts people stay longer.'

"The Aspen Inn has a live folk singer doing 'easy listening' songs and ballads. Tuesday through Friday she sings in the dining room. On Saturday she's in the lounge, but the easy listening is piped loud and clear into the dining room over the PA system.

"Among the several delightful mementos on the wall of the hallway of the Aspen Inn is a set of federal flight rules from the days before there were control towers and radar and before federal regulations became unintelligible. There are 25 rules. All of them make as much sense as the first and last, which are, respectively, 'Don't take the machine into the air unless you are satisfied it can fly' and 'If an emergency occurs while flying, land as soon as you can.' "

Vivian Witkind testified that she was the sole author of the article. The article appeared under the by-line of Jack Davis also. Jack Davis is her husband and accompanied her to the Aspen Inn for dinner, but he did not write the article. She testified that the article was written as part of her job of reviewing restaurants for Columbus Monthly at a fee of $200, plus expenses. Her review was based upon a Saturday evening dinner when her husband and she ate at the Aspen Inn in company with a restaurant reviewer from the Dayton Daily News, and his friend. They had reservations, which resulted in their being seated promptly, despite it being a crowded Saturday night. Four different entrees were ordered and there was a good deal of sharing so each diner had an opportunity to be acquainted with the nature of the food ordered by the others. They were in the restaurant only about an hour, during which time they had a pre-dinner drink, hors d'oeuvres, salad, entree, coffee and desserts. The article was written by her as a result of that visit, plus a fifteen to twenty minute phone conversation with the manager of the restaurant.

Witkind had no specific instructions from Columbus Monthly about the nature of the reviews that she would write; in essence, she was to use her own good judgment based upon her opinions. She testified that the entire article was an opinion on her part. She explained that she felt the Aspen Inn, together with a number of other restaurants in Columbus, had a fancy decor but served food that did not live up to the surroundings, resulting in a poor value to the consumer. She coined the phrase "masquerading as restaurants" for this type of restaurant to make this point. She said the Aspen Inn was a "high-class fast-food joint" for the same reason. Witkind described the Aspen Inn as having a problem of a geographical schizophrenia to indicate the incongruity of having a Colorado ski decor and a Key West seafood menu. Her article was admittedly harsh about the quality of the food, which in her opinion was out of line for the price charged. She said the manager had told her by telephone that he did not emphasize desserts because he wanted to turn over the tables faster. The manager did not testify or rebut that statement. After she turned in the article, she had no further discussion with the Columbus Monthly and it was edited and printed, basically as written.

Her husband testified that his name was on the by-line but that he did not write the article, although he had eaten

there and made comments about the food to his wife.

Max Brown, the Editor and Publisher of Columbus Monthly, had employed Witkind. He did not tell her how to write her restaurant reviews. The editor of Columbus Monthly edited the article, but did not change the substantive content. The lead-in to the article, which is called a "read-out," was written by his staff. It merely said, "Order the spareribs at the Tamarack, a handsome restaurant with (fortunately) a comfortable bar. The Aspen, a ski-motif restaurant where the menu leans heavily to Key West seafood, has a bit of a split personality." He said there was no need to state in the article that it was only the opinion of the reviewers, as a review of a restaurant by definition is an opinion.

Greer (misspelled in the article "Grier") testified that he bought the Aspen Inn in 1974 and operated it as a Subchapter S corporation until he formed the Lynnee Corporation in January 1979, after which the ownership was placed in that corporation. He was around the restaurant quite a bit, although not actively involved in managing it. He admitted that he did not object to his name being mentioned with the Aspen Inn in a prior Citizen-Journal restaurant review that was favorable to the Aspen Inn.

The night manager testified generally that he disagreed with the opinion in the article and, in particular, that the owners were trying to milk all the profit they could out of the restaurant. He specifically stated that Lawry's Seasoned Salt was not used, at least at night when he was on duty, but was unable to explain a substantial purchase order by the Aspen Inn of Lawry's Seasoned Salt.

The trial court directed a verdict for defendants on the basis that reasonable minds could not differ but that no actionable libel was proved, giving several reasons therefor.

The test for a directed verdict, as stated in Civ. R. 50(A)(4), is as follows:

"When granted on the evidence. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

The primary issue is whether the article contained actionable libel.

The article, reviewed as a whole, contained no actionable libel. The offending parts of the article are opinions only, sometimes in hyperbole form. There are no libelous misstatements of fact. By its very nature, an article commenting upon the quality of a restaurant or its food, like a review of a play or movie, constitutes the opinion of the reviewer. The fact that the reviewer's opinion is not shared by the owners of the restaurant or by its regular diners does not make the article actionable.

The theme of the article was that the Aspen Inn is one of a number of restaurants that look like class, but whose food does not live up to its appearance. Whether that observation is valid to the Aspen Inn is not pertinent to this determination. What is pertinent is that a person reviewing a restaurant for a newspaper or magazine has a right to express an honest opinion, albeit a controversial one, without being liable for damages for libel. The reviewer may also infer that owners or operators made shortcuts in preparation of the food served to get the maximum profit for the least amount of expenditure, as that is also an opinion.

Describing the Aspen Inn as having "a geographical schizophrenia" is merely a cute way of stating that its decor is at odds with its menu, a description for which there was a basis that was described accurately.

Plaintiffs were primarily angered by

the description of the quality of their food, such as fish tasting like old ski boots. Obviously, that was a hyperbole used to indicate that the reviewer found the fish to be dry and tough and not a statement of fact to be taken literally. Similar comments were made about other foods. There was a specific statement that the croutons in the salad came from a can and that the salad dressing came from a bottle, as indication of a lack of class as well as use of cost-savings measures. The testimony supported the fact that the croutons did come from a can and that most of the dressing served came from a bottle. It matters not that it could be pointed out that many other restaurants in the price range of the Aspen Inn do the same thing.

In summary, reviewing the article as a whole, as is the proper way to consider it (see *Cleveland Leader Printing Co.* v. *Nethersole* [1911], 84 Ohio St. 118), we find that it stated only the opinions of the reviewer, albeit in an acrimonious and flamboyant form, and was not actionable. We agree with the conclusions that the Louisiana Supreme Court expressed in *Mashburn* v. *Collin* (La. 1977), 355 So. 2d 879. In that case, a restaurant reviewer heaped criticisms upon the plaintiff-restaurant far more severe than those stated about the Aspen Inn. A fish dish was referred to as "trout a la green plague" and a duck dish "as yellow death on duck" and the restaurant as a "burlesque." Referring to these and other comments, the Louisiana Supreme Court, at page 889, stated that the tenor and context of these remarks indicate that they are examples by hyperbole to convey the critic's opinion, noting that when the author speaks of "trout a la green plague" and "yellow death on duck," "it is obvious that an ordinarily reasonable person would not infer that these entrees were actually carriers of communicable diseases." The court concluded that these opinions were not actionable as there was no proof of actual malice and the underlying facts were true, those primarily being that the reviewer actually visited the restaurant and tasted the food.

No one could reasonably read the article about the Aspen Inn and come to the conclusion that the reviewer had inferred any dishonesty on the part of the restaurant or its owners, or that the restaurant was not a legitimate restaurant. The reviewer, in essence, is telling the consumer not to be fooled by the decor because he may be served mediocre food of the quality that you might expect in a fast-food restaurant (parenthetically we might add that we do not intend to impugn the reputation of fast-food restaurants, some of which advertise that merely because their service is fast does not mean their food is not of excellent quality). There is also no question but that the reviewer visited the restaurant, observed the decor and tasted the food.

Criticism, by its nature, is controversial. It is recognized in this case that plaintiffs strongly feel that the criticism leveled at their restaurant, its food and its mode of operation was unjust and unfair. Many of their customers undoubtedly would agree. However, the First Amendment to the United States Constitution protects freedom of speech and the press. Those rights are fundamental to the protection of our democracy and are not to be interfered with lightly. Consequently, the burden of proof upon plaintiffs is a difficult one.

Since the statements are directed against the Aspen Inn, which is public in the context of a restaurant review, plaintiffs must prove actual malice. See *New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254; *Steaks Unlimited, Inc.* v. *Deaner* (C.A. 3, 1980), 623 F. 2d 264; *Mashburn* v. *Collin, supra.*

Actual malice requires the publication of false and defamatory statements with knowledge of their falsity or with reckless disregard of whether such statements are false or not. *New York Times Co.* v. *Sullivan, supra.* Reckless disregard has been defined as evidence sufficient to per-

240

mit the conclusion that the defendant, in fact, entertained serious doubts as to the truth of the publication. *St. Amant* v. *Thompson* (1968), 390 U.S. 727, at 731.

In this case, there was no evidence of actual malice by defendants toward the Aspen Inn. There was no evidence that the author of the critical article or the editor of the magazine had any bad feelings about the Aspen Inn or its owners. Actually, since the Aspen Inn advertised in the Columbus Monthly, if anything, the magazine would be more favorably inclined toward them. There was no knowledge on their part, nor any evidence from which knowledge can be inferred, that they were aware that any of the statements in the article were untrue if, in fact, there were any untruthful statements. While there was a reference to a profit motive, it was not calculated to mean that the Aspen Inn was actually making a high profit but only that profit seemed to be a goal placed above quality. Proof of actual malice cannot be inferred because the author or editor of the magazine failed to attempt to secure profit statements of the Aspen Inn before making the statement. The statement was not directed toward the actual profit-loss statement, but only toward an inferred mercenary motive. Most importantly, however, there was insufficient evidence to permit the conclusion that defendants, in fact, entertained serious doubts of the truth of the statement. See *Dupler* v. *Mansfield Journal* (1980), 64 Ohio St. 2d 116, at 119 [18 O.O.3d 354].

Richard Greer and the Lynnee Corporation also contend that they were not public figures merely because they were the owners of a restaurant and that, therefore, the fair comment rule or qualified-privilege rule does not apply to them. As previously noted, this argument is rejected so far as concerns their activities in the operation of a public restaurant. Additionally, the Lynnee Corporation was not mentioned as an owner and undoubtedly its identity was not known. Richard Greer was mentioned, primarily in the context of why the restaurant had a ski motif. Opinions that might arguably reflect upon the owners because of the operation of the restaurant are subject to the test of actual malice.

Plaintiffs' assignments of error are overruled and the judgment of the trial court is affirmed.

*Judgment affirmed.*

STRAUSBAUGH, P.J., and MOYER, J., concur.